IN THE SUPREME COURT OF NORTH CAROLINA

No. 123A20

Filed 20 November 2020

IN THE MATTER OF: D.L.A.D.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 2 December 2019 by Judge Carlton Terry in District Court, Davidson County. This matter was calendared for argument in the Supreme Court on 7 October 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Surratt Thompson & Ceberio PLLC, by Christopher M. Watford, for petitioner-appellees.*

*Richard Croutharmel for respondent-appellant mother.*

NEWBY, Justice.

Respondent-mother appeals from the trial court's order terminating her parental rights to D.L.A.D.,[1] a minor. We affirm the trial court's order.

Dillon was born to respondent-mother in October 2007 following her brief relationship with petitioner-father. Petitioner-father did not know that he was Dillon's father until 2013, when respondent-mother visited him at his place of employment and requested that he take a DNA test. Petitioner-father agreed, and

---

[1] The minor child D.L.A.D. will be referred to throughout this opinion as "Dillon," which is a pseudonym used to protect the identity of the child and for ease of reading. We use additional pseudonyms to protect the privacy of the parties discussed in this opinion.

the test confirmed his paternity. When petitioner-father learned he was Dillon's father, he went to the Guilford County child support agency and entered into a voluntary support agreement.

Petitioner-father met with Dillon for the first time in May 2015 and began visitation shortly thereafter. In August 2015, Dillon visited petitioner-father and arrived wearing clothing that was soiled, stained, torn, and did not fit properly. Additionally, on at least one visit, he was found to have an excessive amount of earwax in his ears. On 5 November 2015, after respondent-mother violated a court order and failed a drug test, petitioner-father was granted custody of Dillon in accordance with an emergency custody order. From then on, Dillon resided primarily with petitioner-father and his wife (petitioners) in Davidson County.

In early 2016, respondent-mother began conducting supervised visits with Dillon. But these visits eventually ceased, and respondent-mother indicated that she wanted her parental rights to Dillon to be terminated. On 8 March 2016, petitioner-father filed a petition in District Court, Surry County to terminate respondent-mother's parental rights to Dillon. On 16 December 2016, the trial court entered an order terminating respondent-mother's parental rights based on neglect. *See* N.C.G.S. § 7B-1111(a)(1) (2019). Respondent-mother appealed. The Court of Appeals vacated the termination order after concluding that the trial court erred by terminating respondent-mother's parental rights because it lacked subject matter

jurisdiction. *In re D.L.A.D.*, 2017 WL2950772 at \*3 (N.C. Ct. App. 2017) (unpublished).

On 2 May 2019, petitioners filed a new petition to terminate respondent-mother's parental rights in Davidson County on the grounds of neglect and dependency. *See* N.C.G.S. § 7B-1111(a)(1), (6) (2019). Respondent-mother filed an answer denying that grounds existed to terminate her parental rights. On 2 December 2019, the trial court entered an order in which it determined grounds existed to terminate respondent-mother's parental rights based on neglect under N.C.G.S § 7B-1111(a)(1). The court also concluded that it was in Dillon's best interests that respondent-mother's parental rights be terminated. The trial court thus terminated her parental rights. Respondent-mother appeals.

Respondent-mother argues that several of the trial court's findings of fact are not supported by the evidence and that the court erred by concluding that grounds existed to terminate her parental rights. A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination under section 7B-1111(a) of our General Statutes. N.C.G.S. § 7B-1109(f) (2019). We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of

law." *In re Montgomery*, 311 N.C. at 111, 316 S.E.2d at 253 (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)).

In this case the trial court concluded that grounds existed to terminate respondent-mother's parental rights based on neglect. Section 7B-1111(a)(1) provides for termination based on a finding that "[t]he parent has . . . neglected the juvenile" within the meaning of N.C.G.S. § 7B-101(15). Section 7B-101(15) defines a neglected juvenile as one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare[.]" N.C.G.S. § 7B-101(15) (2019). To terminate parental rights based on neglect, "if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. 825, 843, 788 S.E.2d 162, 167 (2016) (citing *In re Ballard*, 311 N.C. 708, 713–15, 319 S.E.2d 227, 231–32 (1984)). "When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.V.A.*, 373 N.C. 207, 212, 835 S.E.2d 425, 430 (2019) (citing *Ballard*, 311 N.C. at 715, 319 S.E.2d at 232).

Here Dillon was not in respondent-mother's custody at the time of the termination hearing and had not been for close to four years. Additionally, because the Department of Social Services was never involved with the parties, no petition alleging neglect was ever filed, and Dillon was never adjudicated neglected. The trial

court did, however, find that Dillon lived "in an environment injurious to his welfare when he was living with Respondent Mother." Respondent-mother does not challenge this finding, and it is therefore binding on appeal. *See In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) ("Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal."). Thus, we conclude that the trial court's findings demonstrate that Dillon was previously neglected by respondent-mother.

We next consider whether the trial court's findings demonstrate that neglect would likely be repeated if Dillon were returned to respondent-mother's care. The trial court made the following relevant findings of fact:

> 9. At the time [Dillon] came into the care of Petitioners [at age seven-and-a-half], he was able to demonstrate how to crush and snort pills. He did not know how to tie his shoes. There is conflicting testimony as to whether he knew how to use any utensils to eat with but the [c]ourt finds that he was using his fingers to eat his food when he came into Petitioner[s]' custody.
>
> 10. Sometime in early 2016, Respondent Mother was to have regular supervised visits that were to be supervised by her sister[.] Only a few of those visits occurred and then they stopped. There were [c]ourt hearings in Surry County, North Carolina regarding custody and visitation, and possibly child support. At one of those hearings, for an unknown subject matter, the Respondent Mother, during a court recess, approached the child's therapist . . . and did in fact grab her by the arm, according to [the therapist's] testimony. Respondent Mother denies having done this.
>
> 11. During a hearing, Respondent Mother stated that she wanted her rights to be terminated and did not want to

know anything further about the minor child, or words to this [e]ffect.

12. Respondent Mother, under oath, denied that [Dillon] had ever[ ] witnessed her crushing pills and snorting them. She stated the last time she had done this was before she had children. She stated she has not used cocaine in the past five years, but she had used it before she had children. However, she was forced to admit on cross examination that she did test positive for cocaine in the fall of 2015.

13. Respondent Mother lives with her boyfriend, [G.H.]. She started dating him sometime around December 2014. She testified that [G.H.] has a prescription for pain medication and instead of taking the medication in the prescribed manner he crushes the pills and snorts them. He has done this the entire time she has known him and he has in fact done this in front of the children.

14. Respondent Mother, following the positive cocaine result from the hair follicle test, took a urine test on her own volition. The test was negative.

15. Respondent mother told [petitioner-father] that she would surrender her parental rights in exchange for the sum of $25,000.00. She denies that she ever lowered that price.

16. There was a period of time of more than twelve months that Respondent mother did not attempt to contact her sister to arrange supervised visits that she was awarded but did beg[i]n talking about visitation again sometime near July 2018.

17. There was some communication to the Petitioners about visitation. Since early 2016, the Petitioners would respond to Respondent Mother's requests with something to the effect that they were busy or that the minor child did not want to see the Respondent Mother.

18. There is evidence that some of the circumstances have changed since the fall of 2015. Respondent mother was awarded, and now receives disability as of May 2019. The minor child is in the primary care of Petitioners. There is no evidence that the condition of Respondent mother's home has changed. [G.H.] still resides in the home and he still snorts his pain medication.

19. In evaluating the credibility of the testimony, the [c]ourt finds and believes Respondent Mother had a substance abuse problem. There is no evidence that she has received any treatment for that problem.

. . . .

22. As to the grounds alleged in N.C.G.S. Section 7B-1111(a)(1), due to the lack of change in the Respondent mother's home, the Court finds that there is a high likelihood of repetition of neglect if the child was to return to her home.

We review only those findings necessary to support the trial court's conclusion that grounds existed to terminate parental rights. *In re B.C.B.*, 374 N.C. 32, 38, 839 S.E.2d 748, 753 (2020). Again, unchallenged findings of fact "are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58.

Respondent-mother first challenges the portion of finding of fact 18 that states "[t]here is no evidence that the condition of Respondent mother's home has changed." Respondent-mother contends that this finding "implicitly shift[ed] the burden to [her] to produce evidence showing that her parental rights should not be terminated."

Though the burden in a proceeding to terminate parental rights ultimately lies with the petitioner, *see* N.C.G.S. § 7B-1109(f), the trial court did not improperly shift the burden to respondent-mother through finding of fact 18. When viewed in the context of the entire termination order, the trial court's finding is merely an expression of its observation that respondent-mother failed to rebut petitioners' clear, cogent, and convincing evidence that the conditions of her home had not changed. *See In re A.R.A.*, 373 N.C. 190, 196, 835 S.E.2d 417, 422 (2019) ("[T]he district court did not improperly shift DSS' burden of proof onto respondent-mother. Rather, the court simply observed that respondent-mother had failed to rebut DSS' clear, cogent, and convincing evidence that she and the father had not established safe and stable housing for the children."). Specifically, this observation appears to relate to the trial court's finding that respondent-mother's boyfriend G.H. still lived in her home and was still snorting his pain medication, just as he did when Dillon previously lived there.

Respondent-mother also contends that finding of fact 18 is erroneous because petitioners presented no evidence that the conditions of her home which were present in 2015 and led to her loss of custody of Dillon continued in 2019. The portion of finding of fact 18 that is directly relevant to the conditions of respondent-mother's home is that concerning G.H. continuing to reside in her home and snorting his pain medication. Respondent-mother does not challenge the portion of the finding that her boyfriend resides in her home. Furthermore, at the termination hearing, respondent-

mother testified that G.H. had a prescription for pain medication and had been snorting his medication for as long as she had known him. Accordingly, we find that clear, cogent, and convincing evidence supports this finding of fact.

Respondent-mother next challenges the portion of finding of fact 19 which stated that she "had a substance abuse problem." Respondent-mother asserts that the only evidence that she ever used illegal substances was a single positive drug test in 2015. However, in addition to respondent-mother's positive test for "'benzos and cocaine" in 2015, respondent-mother has a criminal record which includes convictions for possession of a Schedule IV controlled substance and misdemeanor possession of drug paraphernalia. Thus, the trial court could reasonably infer from this evidence that respondent-mother previously had a substance abuse problem.

Respondent-mother further challenges the final portion of finding of fact 19 because she claims no evidence in the record indicates that she never received treatment for substance abuse. Finding of fact 19, however, simply states that there is no evidence that respondent-mother *did* receive substance abuse treatment. Because the record does support a finding that respondent-mother had a substance abuse problem, and no evidence on the record indicates she received any treatment for this problem, this portion of the trial court's finding is supported by clear, cogent, and convincing evidence.

Respondent-mother next challenges both finding of fact 22, which states that there is a likelihood of repetition of neglect "due to the lack of change" in her home,

and the trial court's conclusion that grounds existed to terminate her parental rights under N.C.G.S. § 7B-1111(a)(1). We note that the challenged finding of fact is a conclusion of law, and we will review it accordingly in conjunction with respondent-mother's challenges to the trial court's explicit conclusion of law that her parental rights should be terminated on the ground of neglect. *See In re J.O.D.*, 374 N.C. 797, 807, 844 S.E.2d 570, 578 (2020) ("[T]he trial court's determination that neglect is likely to reoccur if [a child is] returned to his [parent's] care is more properly classified as a conclusion of law . . . . Although the trial court labeled these conclusions of law as findings of fact, 'findings of fact [which] are essentially conclusions of law . . . will be treated as such on appeal.' ").

Respondent-mother asserts both that there was insufficient evidence and that the trial court made insufficient findings to support a conclusion that neglect would likely continue. The trial court's conclusion that there would be a repetition of neglect if Dillon were returned to respondent-mother's custody was based on its determination that there had been no change in respondent-mother's home. We review conclusions of law on the existence of grounds to terminate parental rights *de novo. In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the [trial court]." *In re Greens of Pine Glen P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003). Therefore, in our analysis of whether the court erred in concluding the ground of neglect exists to terminate respondent-mother's parental

rights, we are not limited to the trial court's determination that the probability of continuing neglect is due to the lack of change in respondent-mother's home. Instead, we consider the totality of the trial court's findings in determining whether its conclusion was supported.

The trial court's findings of fact that support its conclusion that future neglect is likely are: (1) that respondent-mother originally stated that she wished to have her parental rights terminated and offered to relinquish them for $25,000.00, and that she never lowered that price; (2) that respondent-mother did not attempt to visit with Dillon for a period of over a year; (3) that respondent-mother had substance abuse issues, and no evidence shows she was ever treated for those issues; and (4) that G.H. continued to live in her home and snort pain medication. Moreover, the trial court complied with State law and specifically considered evidence of changed circumstances; it noted that respondent-mother now receives disability payments.

Based on all of these findings, the trial court could reasonably conclude that Dillon would likely be neglected in the future if he were placed in respondent-mother's custody. In open court, she stated her desire to terminate her parental rights. In 2016 she apparently conditioned her willingness to give up her parental rights on being paid $25,000.00, and, after she was questioned on this point, the trial court concluded she never lowered that price. Both of these indicate a future propensity to be inattentive to the child. An extended period in which a parent does

not attempt to visit the child could show the same.[2] Next, a substance abuse problem that likely went untreated could inhibit a parent's capability or willingness to consistently provide adequate care to a child. In addition, although there was conflicting evidence regarding whether Dillon knew how to use eating utensils, the trial court ultimately found that he used his fingers to eat when he came into petitioners' custody at age seven-and-a-half. Finally, respondent-mother's apparent indifference to Dillon's ability from a young age to consume drugs in a way that violates standard professional recommendations could show a lack of the judgment required to keep a child safe. That simple fact is not undermined just because the substances G.H. consumes may themselves be legal to possess. Therefore, the trial court's findings support not only the conclusion that Dillon was neglected in the past, but also that neglect would likely continue in the future.

Nor does the trial court's conclusion lose its footing simply because respondent-mother recently expressed a desire to visit Dillon, or because she now contests the termination of her parental rights. *See, e.g.*, *In re Williamson*, 91 N.C. App. 668, 674, 373 S.E.2d 317, 320 (1998) ("Moreover, while the evidence also shows that respondent frequently inquired about [the child] and stated that he loved [the child] in his correspondence with his sister, this evidence does not necessarily negate the court's

---

[2] Though petitioners apparently resisted respondent-mother's efforts to visit Dillon at times, the facts indicate that respondent-mother did not attempt to visit Dillon at all for a period of over a year.

finding that the child has been neglected."). Such expressions of minimally basic care matter, and the trial court was in fact aware of them in this case. But they need not outweigh the abundant evidence that, when viewed reasonably and as a whole, demonstrates a lack of capability or willingness on the part of respondent-mother to adequately care for Dillon.

We thus affirm the trial court's conclusion that grounds existed under N.C.G.S. § 7B-1111(a)(1) to terminate respondent-mother's parental rights.

AFFIRMED.

Justice EARLS, dissenting.

In this case, the trial court failed to make findings of fact to support its conclusion that there was "a likelihood of future neglect by [respondent]" as required under N.C.G.S. § 7B-1111(a)(1) when "the child has been separated from the parent for a long period of time." *In re N.P.*, 374 N.C. 61, 63 (2020). Accordingly, I dissent from the majority's affirmance of the trial court's order terminating respondent's parental rights to her son, Dillon. The majority's holding that the requirements of § 7B-1111(a)(1) have been met is based entirely on evidence of respondent's conduct in 2015 and 2016—the majority does not address the "evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.V.A.*, 373 N.C. 207, 212 (2019). This holding is inconsistent with the juvenile code, with our precedents, and with the fundamental protections all parents enjoy in termination proceedings.[1] Because the record

---

[1] The majority states its belief that "the trial court complied with State law and specifically considered evidence of changed circumstances; it noted that respondent-mother now receives disability payments." Yet the trial court's obligation to consider changed circumstances is not a mere formality. It is not enough that the trial court "noted" one changed circumstance. Instead, the trial court must analyze all of respondent's changed circumstances and explain how the changes connect to its ultimate disposition. *See Coble v. Coble,* 300 N.C. 708, 712 (1980) ("The purpose of the requirement that the court make findings of those specific facts which support its ultimate disposition of the case is to allow a reviewing court to determine from the record whether the judgment and the legal conclusions which underlie it represent a correct application of the law. The requirement for appropriately detailed findings is thus not a mere formality or a rule of empty ritual; it is designed instead to dispose of the issues raised by the pleadings and to allow the appellate courts to perform their proper function in the judicial system.") (cleaned up).

contains no evidence that could support the conclusion that there is a likelihood of future neglect by respondent, I believe the proper course is to vacate the trial court's order and reverse.

Respondent has not had custody of Dillon since November 2015. She does not dispute that her conduct around the time that she lost custody of Dillon was inconsistent with her responsibilities as a parent. She tested positive for "benzos and cocaine." Most significantly, she failed to provide Dillon with clean clothing or maintain his personal hygiene. The record supports the trial court's finding of fact that Dillon "did live in an environment injurious to his welfare when he was living with respondent." Respondent does not challenge this finding of fact, which supports by clear, cogent, and convincing evidence the conclusion that respondent previously neglected Dillon within the meaning of N.C.G.S. § 7B-1111(a)(1).

However, finding that respondent previously neglected Dillon is only one half of the necessary inquiry. Proof that respondent previously neglected Dillon is insufficient to establish that her parental rights may be terminated. When, as in this case, "it cannot be shown that a parent is neglecting his or her child at the time of the termination hearing because the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re Z.V.A.*, 373 N.C. at 211–12. Although respondent's past conduct may be relevant in assessing the likelihood that she will neglect Dillon in the future, we have long held that the "determinative factors must be the best interests

of the child and the fitness of the parent to care for the child *at the time of the termination proceeding*." *In re Ballard*, 311 N.C. 708, 715 (1984). "[T]ermination of parental rights for neglect may not be based solely on conditions which existed in the distant past but no longer exist." *Id.* at 714.

In termination proceedings, the burden is on the petitioners to prove by clear, cogent, and convincing evidence the existence of all the legal elements of an alleged ground for terminating parental rights, including a likelihood of future neglect by the parent. *See, e.g., In re A.R.A.*, 373 N.C. 190, 194 (2019). It is readily apparent that, in this case, the petitioners have failed to carry their burden. The trial court's sole finding of fact directly addressing the likelihood of future neglect by respondent is that "due to the lack of change in the Respondent mother's home, the Court finds that there is a high likelihood of repetition of neglect if the child was to return to her home." Even if the past conditions of respondent's home justified the conclusion that she previously neglected Dillon, the burden was still on the petitioners to affirmatively prove that (1) the conditions of respondent's home had not changed, and (2) those unchanged conditions currently indicate that respondent will likely neglect Dillon again in the future. The trial court's findings are plainly insufficient to support either conclusion.

In the absence of findings directly supporting the trial court's conclusion that respondent was likely to neglect Dillon in the future, the majority looks to the "the totality of the trial court's findings in determining whether its conclusion was

supported." Ultimately, the majority rests upon four other findings of fact which, in its view, "support [the trial court's] conclusion that future neglect is likely." Yet these findings of fact are either not probative or not supported by the record.

First, respondent's statement to petitioner that she would relinquish her parental rights for $25,000 is not probative because it occurred in 2016 and has been repudiated by respondent's subsequent conduct. It is undoubtedly correct that respondent's extremely troubling comments were sufficient to "indicate a future propensity to be inattentive to the child" at the time the comments were made. But the trial court made no finding that respondent's desire to relinquish her parental rights extended beyond 2016. Indeed, such a finding would be inconsistent with her actions in this termination proceeding, as well as her consistent efforts to stay connected to Dillon and to exercise her visitation rights in 2018 and 2019. The fact that she has, by her actions, disavowed her previous statement—which occurred years ago—is precisely the kind of "changed circumstance[] occurring between the period of past neglect and the time of the termination hearing" that the trial court must consider. *In re Z.V.A.*, 373 N.C. at 212. Further, the connection between a statement uttered in 2016 and "the fitness of [respondent] to care for the child *at the time of the termination proceeding*" is highly attenuated, *In re Ballard*, 311 N.C. at 715, and respondent's vigorous assertion of her parental rights in the intervening years negates the probative value of her past comments. By relying upon a statement made in 2016 during an angry confrontation with petitioner to support its conclusion

that respondent is likely to neglect Dillon in the future, the majority collapses the "past neglect" and "likelihood of future neglect" inquiries into a single-factor test, impermissibly rendering the latter superfluous.

Second, the trial court's finding of fact that "there was a period of more than twelve months that Respondent mother did not contact her sister to arrange supervised visits that she was awarded" is not clear, cogent, and convincing evidence that respondent is likely to neglect Dillon in the future. As the trial court also found, "[s]ince early 2016, the Petitioners would respond to Respondent Mother's requests [for visitation] with something to the effect that they were busy or that the minor child did not want to see the Respondent Mother." This unchallenged finding of fact establishes that respondent's lack of visitation was not illustrative of her capacity or willingness to care for Dillon. *Cf. In re E.B.*, 847 S.E.2d 666, 674 (N.C. 2020) (in willful abandonment context, "it is relevant that respondent ceased visitation . . . after a breakdown in his relationship with petitioners, in that there was another possible cause for respondent's inconsistent visitation apart from a willful intent to abandon his child"); *In re Young*, 346 N.C. 244, 252 (1997) (failure to consider "probable hostile relationship between respondent and petitioner's family members who cared for [juvenile] during [] period of time" in which respondent did not attend visits diminishes significance of finding that there was a lack of visitation). This finding also suggests that respondent made efforts to initiate and maintain visitation with Dillon stretching back to around the time she initially lost custody of him. The

majority claims that "[a]n extended period in which a parent does not attempt to visit the child when she is allowed to" could indicate a "future propensity to be inattentive to the child." Once again, the majority emphasizes respondent's conduct in 2016 without accounting for her actions in the intervening years. Dillon's father testified that he recalled respondent asking for visitation on two occasions in 2017. Further, the trial court found that respondent "began talking about visitation again sometime near July 2018." The circumstance that might support an inference of respondent's "future propensity to be inattentive to the child"—her failure to attempt to exercise her right to visits with Dillon—has changed. Accordingly, this fact does not support the conclusion that there is a likelihood of future neglect by respondent.

Third, the majority's reliance on the trial court's finding that respondent "had substance abuse issues" also misses the mark. The majority claims that based on respondent's positive test for "benzos and cocaine" in 2015, and her "criminal record which includes convictions for possession of a Schedule IV controlled substance and misdemeanor possession of drug paraphernalia," the trial court could "reasonably infer . . . that respondent-mother previously had a substance abuse problem." I disagree. Although respondent tested positive for narcotics on a hair follicle test conducted in the fall of 2015, respondent tested negative on a urine test that she took "on her own volition" shortly thereafter. And while it is correct that respondent has previously been convicted for drug related offenses, none of these convictions establish that respondent herself personally abused illegal substances. Crucially,

there is no indication in the record as to *when* those convictions occurred.[2] The only other evidence of respondent's purported substance abuse is respondent's sister's testimony that she "had concerns" about respondent based on "just some kinds of behavior and, honestly, hearsay," by which she meant her recollection that another sibling once told her that respondent was "snorting cocaine" at their mother's funeral. Respondent's sister also testified that she had never personally observed respondent abusing illegal substances.

Even if respondent previously had a substance abuse problem, evidence of her substance abuse in 2015 is of only extremely limited probative value in assessing the likelihood that she will neglect Dillon in the future. Respondent's past drug use is, standing alone and without further explanation, simply not enough to prove that her parental rights may be terminated pursuant to § 7B-1111(a)(1). As the Court of Appeals has rightfully held, it is not enough to prove that a respondent-parent has abused or continues to abuse illicit substances. Rather, "the burden is upon the petitioner to show that the parent's substance abuse would prevent the parent from providing for the proper care and supervision of the child." *In re D.T.N.A.*, 250 N.C. App. 582, 585 (2016). In this case, that means petitioner must bring forth "evidence

---

[2] The transcript from the termination hearing indicates that these convictions occurred more than ten years ago. In response to the question "Can you tell the Court what convictions you've had for criminal activity within the last ten years?", respondent replied "[v]iolating probation" and did not mention any of the drug-related offenses. Later, when the juvenile's guardian *ad litem* is asked if he knew when the drug-related convictions occurred, he responded that "I honestly do not."

to indicate that respondent's alleged drug or substance abuse would prevent [her] from providing for the proper care and supervision of [the juvenile]." *Id. See also In re Phifer*, 67 N.C. App. 16, 25 (1984) ("A finding of fact that a parent abuses alcohol, without proof of adverse impact upon the child, is not a sufficient basis for an adjudication of termination of parental rights for neglect"). And, as we have recently held, when the evidence of a respondent-parent's past drug use is equivocal, the trial court must offer "greater explanation" than mere reference to a failed drug test in order to "support a determination as to the likelihood of future neglect." *In re K.N.*, 373 N.C. 274, 283 (2020). The trial court must consider "the nature and extent of respondent's earlier substance abuse issues." *Id.* We have also recently held that a parent's current drug use is "insufficient to support the conclusion" that the requirements of § 7B-1111(a)(1) have been satisfied unless the trial court "analyzes how th[is] fact[] connect[s] with the specific determinative question of respondent's future likelihood of neglecting [the child]." *In re E.B.*, 847 S.E.2d at 675. Thus, our precedents conclusively establish that evidence of respondent's purported substance abuse problem is not clear, cogent, and convincing evidence of a likelihood of future neglect by respondent.

The majority attempts to overcome this evidentiary deficit by noting the trial court's finding of fact that "[t]here is no evidence that [respondent] has received any treatment for [her substance abuse] problem." As a threshold matter, the burden is on the petitioners to prove that respondent currently has a substance abuse problem

that renders her likely to neglect Dillon in the future, not on respondent to prove that she is a constitutionally fit parent. *In re Montgomery*, 311 N.C. 101, 110 (1984). A lack of evidence of respondent receiving treatment for her alleged prior substance abuse problem is not proof of an ongoing substance abuse issue, especially given that there is no evidence indicating that respondent has abused illegal substances even a single time since 2015. The trial court made no finding of fact that respondent has a substance abuse problem currently. To reach the opposite conclusion, the majority not only "improperly finds facts in this case, which is a job reserved for the trial court," it invents them out of whole cloth. *In re E.B.*, 847 S.E.2d at 677 (Newby, J., concurring in the result only).

Regardless, assuming *arguendo* that there was sufficient evidence in the record to support the finding that respondent currently has a substance abuse problem, the majority still fails to explain how this problem will adversely impact Dillon. According to the majority, "a substance abuse problem that likely went untreated could inhibit a parent's capability or willingness to consistently provide adequate care to a child." This generalized, conjectural inference is no substitute for an individualized analysis of how respondent's substance abuse problem implicates her own present and future "capability or willingness to provide adequate care to" Dillon. Just as a "respondent's incarceration, by itself, cannot serve as clear, cogent, and convincing evidence of neglect," and can only be evidence supporting termination of parental rights "depend[ing] upon an analysis of the relevant facts and

circumstances," the mere existence of a substance abuse problem would be insufficient to prove a likelihood of future neglect by respondent. *In re K.N.*, 373 N.C. 274, 282–83 (2020).[3]

Fourth, the majority does rely upon one finding of fact which is supported by evidence in the record and which establishes that conditions in respondent's home have not changed in at least one regard since she lost custody of Dillon—the fact that "[respondent's boyfriend] continued to live in her home and snort pain medication." According to the majority, respondent's "indifference to Dillon's ability from a young age to consume drugs in a way that violates standard professional recommendations could show a lack of the judgment required to keep a child safe." To be clear, the question presented to this Court is not whether or not it is advisable for a parent to

---

[3] The majority's reasoning has potentially dramatic implications. As a practical matter, upwards of 12 percent of children aged 17 or younger "live in households in the United States with at least one parent who had a [substance use disorder]." Rachel N. Lipari & Struther L. Van Horn, *Children Living With Parents Who Have A Substance Use Disorder*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION (SAMHSA), U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (2015), https://www.samhsa.gov/data/sites/default/files/report_3223/ShortReport-3223.html. Not all of those children are neglected children, and not all of those parents are likely to neglect their children in the future. Further, establishing the majority's reasoning as precedent will likely generate racially disparate consequences within the child welfare system, given that minorities are disproportionately likely to be arrested for drug-related offenses. *See, e.g.*, Cassia Spohn, *Race, Crime, and Punishment in the Twentieth and Twenty-First Centuries*, 44 CRIME & JUST. 49, 65-66 (2015) (summarizing numerous studies finding that minorities make up a disproportionate percentage of criminal drug offenders). It is also doubtful that the majority's reliance on a generalization about parents with substance abuse issues is sufficiently protective of every parent's paramount liberty interest in the care, custody, and control of his or her children. *See, e.g.*, *In re Montgomery*, 311 N.C. at 106 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).

allow his or her child to witness an adult ingest prescription medications "in a way that violates standard professional recommendations." The standard against which parents are judged is not the Platonic ideal. *Cf. In re E.B.*, 847 S.E.2d at 673 (that a parent exhibits "less than ideal parenting practices" does not justify terminating parental rights); *In re Adoption of Leland*, 65 Mass. App. Ct. 580, 583–84 (2006) ("[A] determination of current parental unfitness is not focused upon whether the parent is a good one, let alone an ideal one; rather, the inquiry is whether the parent is so bad as to place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.") (cleaned up). Instead, "the court may appropriately conclude that the child is neglected" only when "a parent has failed or is unable to *adequately* provide for his [or her] child's physical and economic needs, and it appears that the parent will not or is not able to correct those inadequate conditions within a reasonable time." *In re Montgomery*, 311 N.C. at 109 (emphasis added). There is no evidence in the record to support a conclusion that respondent will be unable to stop her boyfriend from snorting pain medications in front of Dillon or that her failure to do so will cause Dillon harm. Absent such findings, the majority's assertion that respondent's decision to continue living with her boyfriend is evidence that she is likely to neglect Dillon in the future stretches N.C.G.S. § 7B-1111(a)(1) beyond recognition.

Our task in examining adjudicatory orders terminating a parent's rights to his or her child is not to judge parents against our own view of what constitutes a good

parent. Nor is it our task, at the adjudicatory stage, to identify and secure the custodial arrangement that we believe advances the best interests of the juvenile.[4] Our only role is to examine the trial court's order and determine if it is based on evidence in the record establishing that the petitioners have met their burden of proving one of the statutorily enumerated grounds for terminating parental rights. In this case, the evidence in the record fails to support the trial court's conclusion that the petitioners have successfully carried their burden of proving by clear, cogent, and convincing evidence that there was "a likelihood of future neglect by the parent" as required under N.C.G.S. § 7B-1111(a)(1). Therefore, I respectfully dissent.

---

[4] It is correct that, as we have often stated, "the best interest of the child is the polar star." *In re Montgomery*, 311 N.C. at 109. However, a trial court may only proceed to "the dispositional stage at which point it must determine whether terminating the parent's rights is in the juvenile's best interests" after the court "determines at the adjudicatory stage that one or more of the grounds in N.C.G.S. § 7B-1111(a) exists to terminate parental rights." *In re K.L.M.*, 375 N.C. 118, 121 (2020). Thus, until the trial court has concluded that a ground exists to terminate parental rights, "the constitutionally protected paramount right of parents to custody, care, and control of their children must prevail." *Petersen v. Rogers*, 337 N.C. 397, 403–04 (1994).